UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                        CASE NO.: 6:24-cr-23-CEM-RMN

v.

MATTHEW REED DIONE,

     Defendant.

_____/

## SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE

Mr. Dione requests this Court grant a variance based on Supreme Court precedent and the factors set forth under 18 U.S.C. § 3553.

## STATEMENT OF FACTS

On July 2, 2024, Mr. Dione pled guilty to enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b). Doc. 43. Mr. Dione's sentencing hearing is set for February 19, 2025. Doc. 61. Based on an offense level of 38 and criminal history category of I, the guidelines recommend 235 to 293 months imprisonment. *See* PSR at ¶ 68.  However, Mr. Dione has raised objections to the Presentence Report. If granted, he will be facing an offense level of 34 and a criminal history category of I. Thus, he would be facing an imprisonment range of 151 to 188 months. PSR at ¶ 40.

## MEMORANDUM OF LAW

### *Introduction*

The dilemma of Mr. Dione's sentencing is how to achieve a just resolution in a case that involves both egregious conduct and substantial mitigation. Consequently, Mr. Dione's case presents "a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007)(citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). The Indictment and PSR cast Mr. Dione as a villain deserving of retribution. The sentencing guidelines follow with a rigid matrix that only considers Mr. Dione's criminal conduct in arriving at an incredibly severe sentence. Such a result makes the undersigned question if pleading guilty to child exploitation is really worth it since defendants are essentially looking at spending the majority of their lives behind bars.

Nevertheless, Supreme Court precedent, in contrast to the guidelines, demand a lot more than sentences that only consider the defendant's crime. Indeed, "[t]here is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her "as an individual.'" *Concepcion v. United States,* 597 U.S. 481, 486 (2022)(citation omitted). A court must consider a wide breadth of information to ensure that the punishment will suit not merely the offense since "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *Pepper v. U.S.*, 562 U.S. 476 (2011).

1

Consistent with this obligation, 18 U.S.C. § 3553(a) requires a court to contemplate a broad range of information in determining a defendant's sentence rather than limiting its consideration to the advisory sentencing guidelines. Thus, a court must consider seven statutory factors under § 3353(a), with the guidelines just being one of the seven factors. *See* 18 U.S.C. § 3553(a)(1)-(7).[1]

The following chapters analyze the § 3553 factors in Mr. Dione's case. Such an analysis indicates that these sentencing factors support his request for a variance. While Mr. Dione's conduct was reprehensible, there are significant mitigating factors in his case. Thus, this memorandum concludes that the imposition of a guideline sentence in Mr. Dione's case violates a court's duty to impose a sentence that is sufficient but not greater than, to satisfy the purposes of § 3553(a). *See Pepper*, 562 U.S. at 476. (a "sentencing judge's overarching duty under § 3553(a) [is to] to impose a sentence sufficient, but not greater than necessary").

## Chapter 1
## Nature of the Offense and the History of the Defendant

In combining a defendant's criminal conduct with his personal history and characteristics in one category, the first § 3553(a) factor comprehends that a defendant's criminal conduct should be examined against the context of his entire

---

[1] The most explicit statutory recognition of this principle states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See* 18 U.S.C. § 3577.

existence. Mr. Dione's actions, no matter how reprehensible, cannot be considered in isolation or even as the paramount punishment factor. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (Rakoff, J.).

This tenet that Mr. Dione's offense conduct cannot be the sole measure of his fate is critical to a just result. Notwithstanding his serious conduct, Mr. Dione has demonstrated exemplary qualities throughout his life. *See Letters of Support*, hereto attached as Exhibit 1.  A consistent theme running in the letters of support is Mr. Dione has been characterized by compassion, generosity, and commitment. *See, e.g.*, Ex. 1 at *Letter of Gregory Dione* ("He cares about the people he loves and has shown it at every opportunity"); *Letter of David Cabal* ("He is known for his generosity and dedication to helping others"); *Letter of Sean Hill* ("His empathy and concern for others are qualities that I have seen time and again").

As Michelle Tchu writes:

> Matt is, without question, one of the kindest, most patient, and most compassionate individuals I have ever met. He is someone who consistently puts others before himself, ensuring that those around him feel comfortable, cared for, and supported.

*Id.* at *Letter of Michelle Tchu. See also id.* at *Letter of Serge Zvonok* ("One of the most commendable qualities of Mr. Dione is his unwavering dedication to helping those in need. In many instances, he reached out a helping hand to his family and friends, never asking for anything in return").

In support of these sentiments, the *Letters of Support* describe Mr. Dione's countless acts of compassion and generosity. As Sean Hill states: "Matt has

consistently demonstrated a compassionate and generous nature. He has always been willing to help others, whether through volunteer efforts, supporting friends and family in times of need, or simply offering a sympathetic ear." *See* Ex. 1 at Letter of Sean Hill); *see also id.* at *Letter of Carmen Rodriguez* ("He is always willing to help others; if he sees a need, he jumps right in to assist").

The Letters of Support recount Mr. Dione's countless acts of generosity and compassion with both his family and his community. Concerning his family, Cindy Gerber describes her son's kindness while tending to both his father, who suffers from Alzheimer's, and her mother in her last days. See Ex. 1 at *Letter of Cindy Gerber* ("When she was dying, Matt frequently visited her. He was the one she wanted to hold her hand in the hospital as she had the last IV inserted so the needed morphine could be administered").

Patricia Sirmeyer writes that Mr. Dione took her family into his house after Hurricane Ian. Ex. 1 at *Letter of Patricia Sirmeyer*; *see also id.* at *Letter of Autumn Sirmeyer* (noting that Matt took in five family members and two dogs after Hurricane Ian). Notably, Mr. Dione's good works extends to others after natural disasters. *See id.* at Letter of David Cabal ("I remember when Matthew organized a community clean-up event after a severe storm, dedicating his time and resources to help those in need").

Ms. Patricia Sirmeyer further writes of the care that Mr. Dione provided to her after her husband's death and has also demonstrated such care to her elderly neighbors. *Id.* In turn, Cheina Ramos depicts the care that Mr. Dione provides to

his immediate neighbors. Ex. 1 at *Letter of Cheina Ramos* ("He frequently checks in on [his neighbors], especially the elderly, and helps with house projects, lending tools and offering any kind of assistance he can").

Serge Zvonok describes another incident in which Mr. Dione provided a home for someone in need.

> One of the most commendable qualities of Mr. Dione is his unwavering dedication to helping those in need. In many instances, he reached out a helping hand to his family and friends, never asking for anything in return. For example, when a friend was facing financial difficulties, Mr. Dione quietly provided support, let him move into his house rent free, ensuring they could get back on their feet without feeling embarrassed or ashamed. His empathy and willingness to go above and beyond to assist others is truly admirable.

Ex. 1 at *Letter of Serge Zvonok*. Similarly, Cheina Ramos asserts:

> when I first met Matt, he had a roommate who was an acquaintance in dire straits—jobless, with ruined credit, and on the verge of homelessness. Without hesitation, Matt provided shelter, food, and support, asking for nothing in return. This person lived with Matt for a year and a half, during which Matt bore all the additional expenses (food, water, electricity).

*Id.* at *Letter of Cheina Ramos*.

Mr. Dione's great capacity for compassion and kindness may be best captured in his mother's description of his response to a friend's death.

> Five years ago, Matt was living in Florida when his dear friend Andre, while out running, was tragically hit by a car. Within hours, Matt was on a plane to Connecticut to support Andre's family and friends where he stayed day and night in the hospital for nearly a week until Andre was ultimately removed from life support. And during the years after, Matt helped to organize and participated in charity events in Connecticut in Andre's memory.

5

Ex. 1 at *Letter of Cindy Gerber*.  And as the *Letters of Support* establish his compassion and kindness extends to all in need. See Exhibit 1 Ex. 1 at *Letter of Tammy Zurkowski* ("Over the years Matt has volunteered at soup kitchens and homeless shelters" and "[h]e regularly donates blood to the American Red Cross"). *Id.*

A consideration of Mr. Dione's significant history of good works and charitable deeds is essential to arriving at a just result in this case. To be sure, such a history shows that Mr. Dione is more than his criminal acts. To further underscore this tenet, case law supports  the proposition that a defendant's history of charitable deeds and good works supports a variance below the applicable guidelines. *See*, *e.g.*, *United States v. Tomko*, 562 F.3d 558, 569-71 (3d Cir. 2009) (en banc) (where defendant was convicted of tax evasion of $225,000 and faced a guidelines sentence of 12-18 months, district court's sentence to probation on condition of one year home detention was not unreasonable because of his "negligible criminal history, his employment record, his community ties, and his extensive charitable works"); *United States v. Thurston,* 544 F.3d 22, 26 (1st Cir. 2008) (where defendant was convicted of fraud in excess of five million dollars and guidelines capped at 60 months, district court's sentence of 3-months was affirmed based on defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *see also United States v. Cooper*, 394 F.3d 172 (3rd Cir. 2005) (similar).

A critical aspect of Mr. Dione's history and characteristics that this Court

should consider is his post-offense rehabilitation. *See, e.g.*, *Pepper*, 562 U.S. at 492. Because Mr. Dione's conduct ended approximately five years ago, a significant question involves his actions since his criminal conduct ended. *See United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007)("a departure for post offense rehabilitation reflects that, unlike some other defendants, the Defendant had fundamentally changed since his offense, poses a lesser risk to the community, and does not require incarceration for too long"); *Gall v. United States*, 552 U.S. 38 (2007). In the past five years, Mr. Dione has demonstrated significant rehabilitation in three ways.

    1.   *Remorse*

First, Mr. Dione has shown great remorse for his actions. Cindy Gerber, Mr. Dione's mother writes:

> I am aware of the charges against Matt. I can't impress enough to the court how very sorry that he is. The time that he has spent on house arrest these past 12 months has caused him to reflect on what he has done. He thinks about it every day. Recognizing the harm he has caused to his victims; Matt frequently descends into self-loathing and is often inconsolable.

Ex. 1 at *Letter of Cindy Gerber; see id.* at *Letter of Jack Gillespie* ("my conversations with him have indicated to me that he is extremely remorseful and embarrassed by his conduct"); *Letter of Cheina Ramos* ("I am aware of the charges against Matt and know how deeply remorseful he is"). Jack Stultz, a counselor with the ITM group, writes that during their counseling sessions, Mr. Dione demonstrated great remorse for his actions and the harm he caused." *See Letter of*

*Jack Stulz, M.S. & LMT*, attached hereto as Exhibit 2.

Mr. Dione has demonstrated his remorse not only through words, but also his actions. Due to his remorse and to attempt to make amends, Mr. Dione sold his residence to assure that he could pay restitution to all of his victims. To that end, Mr. Dione deposited the restitution money in the undersigned's trust account to be paid to his victims at the time of his sentencing hearing. In the end, Mr. Dione's remorse for and insight into the harm he has caused supports his request for variance. *See, e.g., United States v. Wachowiak*, 412 F.Supp.2d 958, 963 (E.D. Wisc. 2006) *aff'd* 496 F.3d 744 (7th Cir. 2007)(granting 51-month variance in child pornography case based in part on defendant's extreme remorse).

2.    Treatment

A second area in which Mr. Dione demonstrated his rehabilitation is through his committed participation in counseling including sex offender counseling since his arrest. Initially, Mr. Dione participated in a counseling program through the Office of Pretrial Services. After successfully completing that program, Mr. Dione decided to voluntarily participate in sex offender counseling with the ITM (Intensive Treatment Modalities) Group, though it was not required.

Mr. Dione began his treatment with Jack Stultz at ITM in August 2024. In addition to describing Mr. Dione's great remorse, Mr. Stultz states that Mr. Dione has "greatly benefited" from processing concepts involving developing insight into the effect of his actions and the unhealthy rationalization that led to problematic behavior and cause minimization or justification after the conduct occurred. *See*

*id.* Mr. Stulz believes that Mr. Dione "appears to be very amenable to addressing his issues as part of a counseling program. He also appears to be an excellent candidate to succeed in problem sexual behavior counseling after sentencing. *Id.*

Notably, Mr. Dione's committed participation in treatment supports his request for a variance. *Wachowiak*, 412 F.Supp.2d at 963 (granting variance based in part on defendant's participation in treatment).

### 3,    *Cooperation*

A third area demonstrating Mr. Dione's rehabilitation is found in Mr. Dione's cooperation with the Government in cases involving fraud. Pursuant to his cooperation, Mr. Dione not only participated in proffers with the federal government but also provided the federal government with documents necessary to facilitate its investigation. Despite the undersigned's expectation that the Government would pursue Mr. Dione's significant investigative leads, it has declined to file a motion for substantial assistance pursuant to USSG §5K1.1. Nevertheless, this Court should consider Mr. Dione's efforts to mitigate his harm by providing cooperation to the government in support of a variance under § 3553(a). *See United States v. Blue,* 557 F.3d 682, 686 (6th Cir. 2009)("the government's failure to file a Section 5K1.1 departure does not necessarily preclude a sentencing court from taking into account substantial assistance when considering the appropriate sentence in light of the Section 3553(a) factors."); *United States v. Doe***,** 213 Fed.Appx. 660, 663 (10th Cir. Jan. 12, 2007)(unpub); *United States v. Ochoa-Ramos***,** 2008 WL 2062341, at *3 (E.D.Wis. 2008). The

9

Government's inaction is lamentable since Mr. Dione is deserving of mercy. Certainly, Mr. Dione's crime marks a significant deviation from an otherwise exemplary existence.

In the end, moving from a focus on the guidelines' sole consideration of Mr. Dione's criminal history and conduct in favor of his complete story provides a just sentencing examination. If *Concepcion* has any force, the Defendant who committed crimes may be subject to condemnation, but the Defendant as he appears today is worthy of this Court's mercy.

### Chapter 2
### Just Punishment

*All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance.*

Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887)

The PSR's conception of the guidelines results in a prison sentence that is just under 20 years (19 years, 7 months). Thus, the guidelines demand that Mr. Dione to be locked in a cell for some 7,050 days. This is a harsh and unfair punishment.

Furthermore, Mr. Dione has already received and will be subject to substantial punishment for the offense. *See* Hugh LaFollette, *Collateral Consequences of Punishment: Civil Penalties Accompanying a Formal Punishment*, 22 J. of Applied Phil., 241, 244-46 (2005)(discussing and critiquing on proportionality grounds retributivist justification of collateral consequences);

Jeremy Travis, *Invisible Punishment: An Instrument of Social Exclusion, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment* (Marc Mauer & Meda Chesney-Lind eds. 2002). In imposing a just sentence, this Court should also consider the significant punishment resulting from the collateral consequences of Mr. Dione's felony conviction. Prior to the instant offense, Mr. Dione had no felony record. Nevertheless, based on his felony conviction, Mr. Dione will face an overwhelming number of collateral consequences. A congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), summary excerpt attached hereto as Exhibit 3. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id*.

Recognizing the effect of collateral consequences of a felony conviction, federal judges should account for such an impact at sentencing. *See   United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016) (Block, J.) (varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). The *Nesbeth* Court concluded that "sufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful

11

sentence." *Id*. In granting a variance in *Nesbeth*, the court asserted that the collateral effects of a criminal conviction can be "devastating" to a defendant. *Nesbeth*, 2016 WL 3022073, at *1. As Judge Block concluded, "[t]oday, the collateral consequences of criminal convictions form a new civil death." *Id*. at *3.

One of the most significant collateral consequences for Mr. Dione at age 37, will be his lifelong registration as a sex offender. Such registration constitutes a significant punishment. *United States v. Autery,* 555 F.3d 864 (9th Cir. 2009) (where defendant convicted of possession of child pornography, court's sua sponte variance to probation not unreasonable in part because of onerous conditions of probation including registration for life as sex offender, prohibitions on location and affiliations, and restrictions on use of computer).

In addition to his restriction attendant to sex offender registration, such a status will have a significant impact on his future employment prospects and his relationships. *See* Economist, *Unjust and Ineffective* (August 6, 2009). Mr. Dione has already had this experience. After his arrest, Mr. Dione suffered immediate punishment. He lost his job and was rejected by some members of his family and community. Mr. Dione's stigma as a sex offender overcame his exemplary history and his rehabilitation and demonstrates the significant punishment he has already experienced.  Such a result supports a variance in Mr. Dione's case. *See, e.g., Wachowiak*, 412 F.Supp.2d at 963-964 *aff'd* 496 F.3d 744 (7th Cir. 2007)(granting variance based in part on the recognition that "the guidelines failed to account for the significant collateral consequences defendant suffered as a result

12

of his conviction). Like the defendant in *Wachowiak*, Mr. Dione lost his job, his future career is ruined, and he will be forced to live with the stigma of being a convicted sex offender. *Id.* at 963-964.

Finally, as previously noted, Mr. Dione is haunted by remorse for his actions. Ex. 1 at Gerber Letter ("Recognizing the harm he has caused to his victims; Matt frequently descends into self-loathing and is often inconsolable"). While his miserable state results from his own actions, a consideration of Mr. Dione's shame and remorse is also important in terms of the punishment he has received for his crime. *See United States v. Prosperi*, 686 F.3d 32, 47-48 (1st Cir. 2012)(citing the district court's observation that "sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed").

## Chapter 3
### Deterrence

*"No punishment has ever possessed enough power of deterrence to prevent the commission of crimes."*

Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963)

The preceding discussion established that a lengthy prison sentence is inconsistent with a just sentence. In turn, this section addresses the question of whether a long prison sentence will accomplish the § 3553 factor of deterrence. Such an analysis requires an analysis of both general and specific deterrence.

*General Deterrence*

The belief that lengthy prison sentences are effective in deterring crime is the last refuge for the misled. Indeed, it is a false narrative that is not supported by empirical study or evidence.[2] *See* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks:  Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013)(concluding that "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent").

Nevertheless, federal prosecutors consistently argue this factor in support of harsh sentences. And why wouldn't they? If you consistently assert that prison sentences are necessary to prevent future crimes, then minimum mandatories and harsh guideline sentences are entirely rationale. But the troubling aspect of the premise is not only found in its invalidity, but also in its effectuation of mass incarceration. *See* Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015). To be sure, there is no correlation between punishment and reductions in crime. *See id.*  For the Government to argue otherwise may be expected but it is hypocritical, nonetheless. For the Department

---

[2] Limited narratives have a profound and negative impact on decision-making. *See*, *e.g*., Dolan & Henwood, *Five Steps Toward Avoiding Traps in Narrative Decision-Making*, Nat'l Inst. of Health (Aug. 12, 2021); *see also* Akira Kurosawa, *Rashomon* (Daiei Films release on Dec. 26, 1951, in the U.S.). But born out of fear, such narratives satisfy the human desire for certainty. *See*, *e.g*, Maria Konnikova, *Why We Need Answers*, The New Yorker (Apr. 30, 2013).

of Justice (DOJ) has concluded that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit 4. The DOJ has concluded that even increasing the severity of punishment does little to deter crime.

*Specific Deterrence*

The likelihood that the defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper,* 562 U.S. at 492. Having established that prison sentences, regardless of length, have no impact on general deterrence, this section demonstrates that the factor of specific deterrence also supports Mr. Dione's request for a variance. The first part of this section focuses on studies establishing that incarceration has no effect on recidivism. The second part asserts that Mr. Dione's history and characteristics prove that he will never commit another crime.

a. *The relationship between incarceration and recidivism*

As in the case of general deterrence, empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), attached hereto as Exhibit 5. To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than non-custodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of*

*Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders - leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007). *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.  Ex. 5 at 1, 4.

     b.   *Mr. Dione's lower risk of recidivism*

Mr. Dione is 36 years old and has no criminal history. Moreover, he is college educated, has been employed throughout his life, and does not have a substance abuse problem. Because of his education, employment history, and lack of substance abuse and criminal history, Mr. Dione poses a lower risk of recidivism. *See* U.S. Sent. Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004).

Furthermore, Dr. Jeffrey Danziger assessed Mr. Dione's risk of recidivism

using the STATIC-99 actuarial assessment. Dr. Danziger's opines that Mr. Dione's score on this assessment indicates that he poses a mere 2.7% to 3.7% risk of recidivism within a five-year period in the community. *See* PSR Addendum, Danziger Report at ¶ 71. After 20 years, his risk would be a mere 6.3%. *Id.* at 73. After evaluating Mr. Dione, Dr. Danziger opines:

> Of note, the defendant is presently involved in an appropriate and monogamous relationship with a 27-year-old woman, which is reasonable and not pathological for a person of his age. As noted above, he is not in my opinion suffering from any psychiatric, substance use, or antisocial disorder likely to increase the risk of recidivism. It is my opinion he does not suffer from pedophilic disorder, and he is currently amenable and voluntarily seeking sexual related counseling and therapy. In addition, the actuarial Static-99R instrument was not indicative of a heightened risk of recidivism.

Id. at ¶ 87.

In imposing the least sufficient sentence to account for the need to protect the public from further crimes of Mr. Dione, this Court should consider the statistically low risk of recidivism presented by him. *United States v. Urbina*, slip op., 2009 WL 565485, *2-3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties).

## Chapter 4
## Educational, Medical Care, or Other Correctional treatment

> Judges carry the heavy burden of depriving individuals of their liberty. But the Bureau of Prisons shoulders the constitutional burden of protecting the remaining rights of the incarcerated while in custody.

*United States v. Bardell*, 634 F.Supp.3rd 1083, 1084 (M.D. Fla. 2022).

A long prison sentence is not necessary to provide Mr. Dione with educational correctional treatment. Indeed, Mr. Dione does not have a substance abuse problem and is college educated and highly skilled. Recognizing the seriousness of his transgression, Mr. Dione does request sex offender treatment.

A critical issue in his case is Mr. Dione's need for effective medical treatment. Mr. Dione has been diagnosed with degenerative disc disease, as well as a fatty liver. Despite receiving intensive physical therapy, Mr. Dione continues to suffer from two bulging discs in his back. An important consideration in this case is whether Mr. Dione will receive effective care in the Federal Bureau of Prisons (BOP) based on his health concerns. *See, e.g.,* 18 U.S.C. § 3553(a)(2)(D) (stating that the sentence imposed must ensure that needed medical care is provided "in the most effective manner"). This factor reflects the established legal tenet that prisons are required to provide medical care to their inmates. *See*, *e.g*., *Estelle v, Gamble*, 429 U.S. 97 (1976).

Despite the requirements of the Eighth Amendment, the BOP consistently fails to meet the standard of adequate medical care for its inmates. And this failure has persisted over a significant period. An audit by the Office of the Inspector General found systemic deficiencies in the Bureau of Prisons' delivery of health services. The Inspector General found that in numerous instances, the BOP failed to "provide required medical services to inmates," including inadequate treatment for chronic conditions, failure to properly monitor side effects of medication,

allowing unqualified providers to render medical services, and failure to meet performance target levels on treatment of serious conditions. *See* U.S. Dep't of Justice, OIG, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care* ii-xix, 32-34 (2008), *available at* https://oig.justice.gov/reports/BOP/a0808/final.pdf.

Since that 2008 audit, things have not changed. *See* American Ass'n. of Family Physicians, *Incarceration and Health: A Family Medicine Perspective* (July 2021)("Inmates in correctional facilities have significantly higher rates of disease than the general population, and correctional facilities are often an ill-equipped provider for the medically underserved")(citations omitted), available at https://www.aafp.org/about/policies/ all/incarceration.html. *See also* Meg Anderson, *Lawmakers push for federal prison oversight after reports of inadequate medical care*, NPR (Dec. 12, 2023), available at https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-.[3]

The Department of Justice Office of Inspector General recently issued another report in February 2024, concerning inmate deaths in the BOP from 2014 to 2021. *See* U.S. Dep't of Justice, OIG, *Report on Issues Surrounding Inmate*

---

[3] A study of the BOP's response to COVID determined that its incompetence and indifference actually contributed to the spread of the virus. *See* Keri Blakinger and Keegan Hamilton, *"I Begged to Let Me Die": How Federal Prisons Became Coronavirus Death*, The Marshall Project (June 18, 2020),

*Deaths in Federal Bureau of Prisons Institutions* (Feb. 15, 2024), attached hereto as Exhibit 6. The OIG again found deficiencies in the BOP's provision of health care to inmates. Ex. 6 at 1. *See also* Meg Anderson, *1 in 4 Inmate Deaths Happen in the Same Federal Prison. Why?* NPR (Sept. 23, 2023)(finding many serios illnesses went untreated at various BOP facilities until it was too late).   .

Recognizing the problem with the provision of medical care by the BOP, district courts have imposed lesser sentences based on the inadequacy of healthcare in the BOP. *See United States v. Martin*, 363 F.3d 25, 50 (1st Cir. 2004) *United States v. Gee,* 226 F.3d 885 (7th Cir. 2000) (sentencing court's downward departure under §5H1.4 based on defendant's health condition was not abuse of discretion and BOP letter stating that it could take care of any medical problem "was merely a form letter trumpeting [BOP] capability").

## Chapter 5
## The Guidelines

> *If you take a matrix to factor offense severity, overlay it with mandates born of popular outrage, and tailor it purportedly to address almost every eventuality, you get "justice" dictated in advance, marked by visceral condemnation, and based on the pretense of omniscience.*

*United States v. Williams*, 372 F.Supp.2d 1335, 1337-1338 (M.D. Fla. 2005)(Presnell, J.). [4]

---

[4] Although *Williams* was reversed by the Eleventh Circuit in *United States v. Williams*, 456 F.3d 1353 (11th Cir. 2006), the Eleventh Circuit's decision was overruled by the United States Supreme Court. *See Kimbrough v. United States*, 552 U.S. 1353 (2007).

The guidelines recommend an imprisonment sentence of 7,050 days. This recommendation is owed little deference.[5] Promulgated to provide sentencing consistency, the sentencing guidelines have achieved its goal through the consistent imposition of sentences that have been both irrational and unjustly harsh.

The guidelines pose a particular risk for Mr. Dione since their rigid matrix does not account for the unique circumstances of his case. Moreover, in accounting for all aspects of his criminal conduct, they promote certain absurdities at arriving at a severe sentence. A fundamental absurdity and injustice in Mr. Dione's case is the PSR's use of cross-references to punish him for crimes he was never charged with. When the Government made a charging decision in Mr. Dione's case, they considered the evidence and chose to charge him with the enticement of a 17-year-old minor under 18 U.S.C. § 2422(b). In making this decision, the Government assessed the evidence and specifically declined to charge Mr. Dione with production under 18 U.S.C. § 2260. *See* Indictment, Doc. 1. Now, the Government argues for a harsher sentencing result under the production guideline in violation of Mr. Dione's Sixth Amendment right to trial. *See* PSR at ¶ 30.[6]

---

[5] As recognized in *Gall,* district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49. *See also Rita v. United States*, 551 U.S. 338, 351 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

[6] Mr. Dione's case demonstrates the Government's primacy in the sentencing process. The Government can decline to charge certain offenses and seek harsher sentences based on that uncharged offense. It drafts draconian plea agreements that limit a defendant's

Furthermore, the guidelines apply a 2-level enhancement for Mr. Dione's use of his cellular telephone. *See* PSR at ¶ 32. The United States Sentencing Commission designed aggravating enhancements to reflect a defendant's increased culpability. *See, e.g.,* USSG Ch. 1, Pt. A. But in a digital age in which most human interaction is done through cellular telephone communication, the enhancement is not an aggravating factor reflecting a defendant's increased culpability. Rather, since it is a factor present in nearly every case, the enhancement has no relationship to a defendant's culpability.

But such absurdities are not the only issue with a rigid application of a guideline sentence in Mr. Dione's case. Indeed, a mechanical application of the guidelines, which solely rely on his offense conduct as reflected in a rigid sentencing matrix, does not account for the unique factors that mitigate Mr. Dione's sentence – a result that is antagonistic to § 3553(a), as well as *Koon*. In placing offense conduct above all else, the guidelines do not account for Mr. Dione's exemplary history of good works and charitable deeds. *See* Chapter I, *supra*. They do not account for his post-conduct rehabilitation. *See id*. They do not account for his extreme remorse. *Id*. They do not account for his significant attempt to cooperate with the Government. *Id*. They do not account for the significant impact of the collateral consequences of his conviction. *See* Chapter 2,

---

appellate rights by offering the hope of a substantial assistance reduction. But such hope, of course, is the quintessential human delusion, since the substantial assistance reductions rarely comes.

*supra*. They do not account for Mr. Dione's low risk of recidivism. *See* Chapter 3, supra. They do not account for his need for medical treatment. *See* Chapter 4, *supra*.   As this section notes, they do not account for the absurdities inherent in his advisory guideline range.  And finally, they do not account for Mr. Dione's significant efforts to make restitution. *See* Chapter 6, *infra*.

The inability of the guidelines to meet the requirements of § 3553 in Mr. Dione's case constitutes a significant failure and supports his request for a variance.

## Chapter 6
## Restitution

*In imposing a sentence, the Court must consider "the need to provide restitution to any victims of the offense"*

18 U.S.C. § 3553(a)(7)

As previously noted, Mr. Dione sold his house to fully pay restitution to his victims.  Such an effort shows Mr. Dione's remorse, as well as an effort to make amends for his conduct.

## **Conclusion**

Based on the foregoing arguments, Mr. Dione requests a variance in his sentence.

Respectfully submitted,

*/s/ Fritz Scheller*
Fritz Scheller
Florida Bar Number 183113

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all parties this 14th day of February 2025.

/s/ Fritz Scheller
Fritz Scheller
Florida Bar Number 183113
Fritz Scheller, P.L.
200 E. Robinson St., Ste. 1150
Orlando, Florida 32801
Telephone 407-792-1285
Facsimile 407-649-1657
Email: fscheller@flusalaw.com

24